Filed 4/22/16  P. v. Castro CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SALVADOR CASTRO,<br><br>Defendant and Appellant. | F069998<br><br>(Tulare Super. Ct.<br>Case No. VCF027299-95)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Tulare County.  Joseph A. Kalashian, Judge.

Michael Cross, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and Nora S. Weyl, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]      Before Kane, Acting P.J., Peña, J. and Smith, J.

Appellant Salvador Castro appeals the denial of his petition to recall a sentence pursuant to Penal Code section 1170.126.[1]  Appellant claims that insufficient evidence exists in the record of conviction to support the trial court's conclusion that appellant was armed with a firearm during the commission of his current offense.  For the reasons set forth below, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

In 1997, appellant was convicted by a jury of being a felon in possession of a firearm (former § 12021, subd. (a)(1)), and subsequently found to have suffered two prior serious felony convictions.  Appellant was sentenced to a term of 25 years to life, plus a one-year prior prison term enhancement.  In his initial appeal, the following facts were recounted:

"On January 31, 1995, there was a shoot-out at the intersection of Ben Maddox and Houston streets in Visalia.  The shoot-out apparently occurred between rival gang members.  A bystander, Kelly Scott, was killed by a stray bullet during the incident.  The witnesses testified to various accounts, but all agreed that there was some kind of argument between two to three young men who were walking along the street and a number of men in a light colored car waiting for a light at the intersection.  At some point the men began shooting at each other, although there was disagreement over who fired the first shot.

"It was stipulated at trial that the appellant had been previously convicted of a felony.

"Joe Mendoza, a witness to the shooting, testified that he saw two Hispanic young men on the street, one he later identified as Richard Alonzo, waiving [*sic*] a blue rag and

---

[1]     All statutory references are to the Penal Code unless otherwise noted.

[2]     The facts are taken from the transcript of appellant's preliminary hearing and from our prior opinion in appellant's direct appeal from his conviction which is a part of this record.

talking to people in a white car in the intersection. He noticed someone get out through the driver's door of the vehicle and reach behind him for a gun. At that point, Richard Alonzo started firing and the man ran back to the car. After the shooting stopped, he noticed that Kelly Scott, a bystander, had been shot.

"Esther Chavez, another witness testified that she was at the intersection waiting for a light to turn green when she noticed approximately three men at a market at the intersection yelling at men in a car behind her. She believed the yelling began from the car. Ms. Chavez noticed a gun being pointed from the driver's side window of the vehicle and the driver attempted to get out but was pulled back into the car. There was movement within the vehicle and the passengers could have been sharing the weapon. Someone in the car fired first, and there could have been as many as 15 shots fired.

"Rosemary Ornelas, who was with her mother and one year old son, testified that she also witnessed the incident. According to Ms. Ornelas, she saw two boys at the market, one of whom waived [sic] a bandanna. He looked like he was loading a gun and then shot at the car. The back seat passenger on the driver's side got out of the vehicle, but retreated back into the car when the men on the street shot at him. When the shooting stopped she followed the car. She saw it stop and let out a passenger who went over to an apartment. She continued to follow the car, but then turned around to go back to the intersection to see what had happened. On her way back she passed by the apartment and noticed the passenger, later identified as Gilbert Castro,[3] who had gotten out [sic] the of the vehicle. She asked him what happened and he said that someone was trying to kill him. She offered the man a ride which he accepted. Before he got into her car, he retrieved a gun from the bushes and concealed it inside of his jacket.

"A juvenile, Richard A., also testified. He stated that he was with Richard Alonzo during the incident. According to Richard A., the men in the white car called him a

---

[3] Gilbert Castro is not related to appellant.

3.

'scrapa' which is a term of disrespect. He pulled out a knife and the passenger in the car shot at him and he ran away. He also testified that the men in the car were 'nortenos,' members of a northern gang, and that he was a 'sureno,' and that he took the statements as a gang challenge.

"Officer Shear stated that he had spoken to Richard A. who gave him a substantially similar statement after the incident. During his investigation, he was able to locate a white AMC Concord, which belonged to the appellant's live-in girlfriend, which had bullet holes in the body on the driver's side, a broken window, and blood stains on the front passenger headrest. According to a stipulation, samples of the blood found in the car and samples of appellant's blood were sent to a lab for analysis and the two samples matched. There is less than .05 percent of the population that would be expected to have the same blood type as those submitted. In addition, it was stipulated that the blood sample from the car did not match either Gilbert Castro or Adam Garcia, also known as 'Droopy.'

"The officer's testimony also established that approximately 10 nine-millimeter shell casings were found in various locations near the market. In addition, a .25 caliber shell casing and a live round were found in the intersection. Broken glass was found in the intersection near the .25 caliber bullets, and glass was also found inside of the vehicle. No .25 caliber bullets or shell casings were found inside of the car.

"Later that day the officer became aware that appellant had been transported to the hospital for treatment of a gunshot wound to the top of his head. Appellant initially told the officer that he had been shot while walking in another area with his son. He stated that men in a car yelled gang slogans at him and began shooting. After a few minutes, appellant made another statement saying that he had been walking at the corner of Ben Maddox and Houston when he was shot.

"Criminalist Dean Gialmas testified that he analyzed samples taken from appellant's hands which contained gunshot residue. This could have resulted from firing

4.

a gun, or being in the car when the gun was fired. It was stipulated that the samples were indeed taken from appellant.

"It was stipulated that if appellant's five year old son were called to testify he would state that he was in his mother's white car on the day of the shooting with his father. 'Droopy' was driving, and appellant was injured.

"Testimony from Veronica Cabrera, appellant's live-in girlfriend, established that she owned the white AMC Concord in question [although not at the time of the shooting]. She stated that on January 31, 1995, she did not own the car, her mother owned it, but that appellant had been using it to go to work, and that she had told appellant to sell it. She also stated that appellant had told her he had been in the car on the day in question, but she did not need to know more than that.

"Officer Wightman testified appellant had told him that he was walking at the intersection of Ben Maddox and Houston and saw an argument between people in the car and pedestrians on the street and that shooting erupted from the car. Appellant later told the officer that a man ran from a nearby house up to the car and someone in the car said 'What's up, you fucking scraps?' One of the pedestrians waived [*sic*] a blue rag, the driver of the car got out, and the pedestrian pulled out a gun. At that point appellant took his son and ran away, but was shot.

"Joseph Garcia testified that he was driving to the intersection on the day in question when he heard the shots. He followed the white car, observed it stop and let out a passenger.

"Officer Chamberlain established that he was advised of a call for an ambulance on the 700 block of East Houston. Appellant was taken to the hospital for his wounds. Later, the officer went back to that address and spoke with Gilbert Castro."

Relevant to this appeal, Richard A. and Officer Shear were also called to testify at appellant's preliminary hearing. At that hearing, Richard A. testified that he did not recall being with Richard Alonzo on the day of the shooting, could not recall making any

statements to Officer Shear, and directly disclaimed every statement allegedly made to Officer Shear following the shooting except for one, that he could not identify anybody in the car involved in the shooting.

Officer Shear was then called to testify. He recounted Richard A.'s prior statements to him, including that Richard A. had seen "the right front passenger" in the car involved in the shooting "point a gun past the driver at both himself and Alonzo." Officer Shear also testified to other conversations from his investigation, including one with appellant's four-year-old son. Officer Shear testified that appellant's son had identified appellant as having the gun during the shooting. No objections were made to Officer Shear's testimony on these points.

Appellant filed his petition for recall of sentence on February 22, 2013. After many rounds of briefing, the trial court held a hearing on appellant's eligibility for recall of sentence on August 25, 2014, and denied appellant's motion. This appeal timely followed.

## DISCUSSION

Appellant contends the trial court erred in finding he was ineligible for recall of sentence because it lacked substantial evidence to support its determination. In particular, appellant asserts the only evidence before the trial court demonstrating appellant was armed with a firearm was the unreliable hearsay statement of appellant's four-year-old son, as recounted by Officer Shear at the preliminary hearing.

### Standard of Review and Applicable Law

Under the Three Strikes Reform Act of 2012 (the Act), "a prisoner currently serving a sentence of 25 years to life under the pre-Proposition 36 version of the Three Strikes law for a third felony conviction that was not a serious or violent felony may be eligible for resentencing as if he or she only had one prior serious felony conviction." (*People v. White* (2014) 223 Cal.App.4th 512, 517.) To be eligible for resentencing, a prisoner must satisfy the three initial criteria of section 1170.126, subdivision (e).

6.

"As cross-referenced in section 1170.126, subdivision (e)(2), a commitment offense is ineligible for recall of sentence if '*[d]uring [its] commission . . .*, the defendant used a firearm, *was armed with a firearm* or deadly weapon, or intended to cause great bodily injury to another person.' " (*People v. Elder* (2014) 227 Cal.App.4th 1308, 1312.) " '[A]rmed with a firearm' has been statutorily defined and judicially construed to mean having a firearm available for use, either offensively or defensively." (*People v. Osuna* (2014) 225 Cal.App.4th 1020, 1029 (*Osuna*).)

Appellant seeks resentencing through the Act on his conviction for being a felon in possession of a firearm under former section 12021. " 'A defendant possesses a weapon when it is under his dominion and control. [Citation.] A defendant has actual possession when the weapon is in his immediate possession or control. He has constructive possession when the weapon, while not in his actual possession, is nonetheless under his dominion and control, either directly or through others.' " (*Osuna*, *supra*, 225 Cal.App.4th at p. 1029.) "A firearm can be under a person's dominion and control without it being available for use." (*Id.* at p. 1030.)

"Because a determination of eligibility under section 1170.126 does not implicate the Sixth Amendment, a trial court need only find the existence of a disqualifying factor by a preponderance of the evidence." (*Osuna*, *supra*, 225 Cal.App.4th at p. 1040.) "The factual determination of whether the felon-in-possession offense was committed under circumstances that disqualify defendant from resentencing under the Act is analogous to the factual determination of whether a prior conviction was for a serious or violent felony under the three strikes law. Such factual determinations about prior convictions are made by the court based on the record of conviction." (*People v. Hicks* (2014) 231 Cal.App.4th 275, 286.) In this analysis, "the court may examine relevant, reliable, admissible portions of the record of conviction to determine the existence or nonexistence of disqualifying factors." (*People v. Blakely* (2014) 225 Cal.App.4th 1042, 1063.)

On appeal, we review the evidentiary facts properly considered as part of the entire record of conviction "in the light most favorable to the judgment below to determine whether they disclose substantial evidence--that is, evidence which is reasonable, credible and of solid value--such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Garrett* (2001) 92 Cal.App.4th 1417, 1433; see also *People v. Towers* (2007) 150 Cal.App.4th 1273, 1277.)

### *Substantial Evidence Shows Appellant Was Armed With A Firearm*

In this case, we do not need to reach appellant's contention that the testimony of his four-year-old son was insufficiently reliable to support finding appellant ineligible for resentencing. Although the trial court noted the boy's testimony in pronouncing its conclusion, it also expressly stated, in its oral pronouncement and the following order, that it was relying on the "circumstances of the offense" and was "taking all evidence into consideration." There was substantial evidence before the trial court showing appellant was armed with a firearm, even without the contested statement from appellant's son.

As detailed in our opinion from appellant's direct appeal of his conviction, there was ample evidence that appellant was not only in the white car involved in the shooting, but that he was the right front passenger in that car. Appellant admitted to his girlfriend that he was in the white car during the shooting. And appellant's son, through stipulated and uncontested testimony, confirmed appellant was in the car, was not driving, and was wounded in the shooting. With regard to his specific location, appellant suffered a bullet wound to his head during the shooting. An analysis of blood found on the front passenger's side headrest of the white car showed appellant had been wounded while seated there.

Apart from merely being present, however, the trial court had substantial evidence before it to conclude that appellant not only had a gun available for use, but that appellant was the actual shooter. Multiple witnesses testified a gun was present within or shots

8.

were fired from the white car. And gunshot residue was found on appellant's hands, which could have come from either firing the gun or being present in the car when the gun was fired. At trial, Richard A. testified that "the passenger in the car shot at him." However, additional detail regarding the meaning of this statement was provided at the preliminary hearing. There, Richard A. was confronted with statements made to Officer Shear and given an opportunity to explain them, including one in which Richard A. stated he "saw the driver of the vehicle of that car lean back in his seat and . . . saw the passenger in the front point a small-caliber handgun, either a .25 or a .22 out the front and over the driver of the vehicle." When Richard A. denied any recollection of his prior statements, Officer Shear testified regarding his investigation and Richard A.'s prior statement that he "saw the right front passenger in that vehicle point a gun past the driver."

Appellant raised no admissibility challenge to Richard A.'s statements before the court hearing his petition or in his opening brief and, in reply, merely dismisses them as "double hearsay." However, a preliminary hearing transcript, per se, is part of the record of conviction and not excluded by the hearsay rules. (*People v. Reed* (1996) 13 Cal.4th 217, 224-225.) And Richard A.'s prior inconsistent statements, proven by extrinsic evidence after an opportunity to explain or deny the statements, were admissible under Evidence Code sections 770 and 1235. Thus, appellant's argument in reply would be without merit, even if it had been timely raised and developed. Accordingly, reasonable, credible, and solid evidence shows appellant was in the front right passenger seat of the white car and shows the person in that seat possessed a gun.

In light of our conclusion that the evidence is sufficient to find appellant had physical possession of the gun during the shooting, appellant's argument that he could not be found ineligible for only having constructive possession of the gun is moot.

**DISPOSITION**

The order is affirmed.

9.